# THE BALTIMORE & OHIO R. R. CO.

## *vs.*

# HARVEY W. C. WHITACRE.

*Common carriers*: *liability to employees. Act of Congress of April 22, 1909*: *negligence of railroad the gist of the action; contributory negligence; assumption of risk; interstate traffic; train in preparation for——; brakeman going across railroad yard for tin cup. Cinder pits*: *negligent construction; evidence; usage of another company. Expert testimony. Photographs*: *X-rays; authentication by photographer; explanations. Employer and employee*: *assumption of risk. Negligence*: *damages; loss of wages; worth of——; insurance tables. Jury*: *evidence; not mere speculation; taking case from——.*

The provisions of the Act of Congress of April 22nd, 1909, entitled "An Act Relating to the Liability of Common Carriers by Railroad to Their Employees in Certain Cases," was intended to apply to certain cases, and not to all cases between common carriers by railroad and their employees. pp. 425-426

Under the statute, the liability of railroads for injuries to their employees, even in cases arising from defects and insufficiencies in their cars, engines and other appliances, can be based on negligence only.                                p. 426

The Act does not apply to cases of injury from defects, etc., not attributable to negligence.                                p. 426

In any given case, the measure of the carrier's responsibility is that of ordinary care.                                p. 426

If there were any act of negligence on the part of the carrier, the provisions of the Act apply, even though the employee, injured while engaged in interstate commerce, had himself been guilty of contributory negligence, or the accident was due to the negligence of a fellow-servant, provided there had been no assumption of the risk.                                p. 426

A brakeman of a freight train, that was being prepared to engage in interstate commerce, who left the train and went across the railroad yard for a drinking cup, for the engine crew on the trip, is engaged in interstate commerce within the meaning of the Act.                                p. 427

But the mere failure of the "tool boy" of the railroad company to have provided a drinking cup for the engine crew, is not sufficient cause for imputing negligence to the company so as to render it liable for injuries sustained by a brakeman while crossing the railroad yard to find a cup, when it is not proved that the cup was essential to the movement of the train, and when it appeared that the use of the cup depended on individual taste, many preferring the lid of the water cooler.

p. 427

The construction of railroad cinder pits in railroad yards for the dumping of cinders from the engines is not a matter with which average individuals are so brought in such contact with in their daily lives, as to make them necessarily familiar with what is and is not proper construction, as to make proper the exclusion of expert evidence.                                p. 428

The obligation of master and servant begins when the servant, in pursuance of his contract with the master, is rightfully and necessarily upon the premises.                                p. 428

An employee assumes all the risks of dangers which are open and obvious, but not those that arise from the negligence of the master, unless, with knowledge of such dangers, the employee continues to perform his work.                                p. 429

A brakeman is not to be supposed, from his employment, to have assumed risks as to the safety and proper construction of cinder pits, in a place in the railroad yard, where he had no duties or concern.                          p. 430

The theory of the assumption of risks applies only to matters related with, or incident to, the employee's duties; and not to matters in other parts of the premises where he has no duties, and where he has the right to rely on the employer's having performed his entire duty.                          p. 430

In an action for damages, an employee has the right to the testimony of an insurance expert, as to his insurance tables, giving the value of incomes, such as the plaintiff was receiving at the time of the injury.                          p. 430

Such evidence is admissible as a guide to the jury in determining the proper amount of damages.                          p. 431

A jury should not be left with no evidence except vague speculation.                          p. 431

Insurance tables of expectancy, based on actual and large experience of insurance companies, while not conclusive, are recognized as the best character of evidence obtainable for such a purpose.                          p. 431

But the mere opinion of a physician, as to the expectation of life of the plaintiff, where there is nothing to show upon what the opinion was formed, is not admissible for such purpose.

p. 431

Upon the trial of issues involving questions of fractured bones, etc., photographs by X-rays, etc. (properly authenticated), are admissible in evidence, and it is admissible and proper to examine the photographer as to the angle of light, etc., at which the photographs have been taken.                          p. 431

In an action for damages because of the negligence of the defendant, if there is any legal evidence tending to show such negligence, it is error to withdraw the case from the jury.

p. 432

Upon trial of issues involving the negligence of the defendant in the construction of the appliance by which the plaintiff was

injured, evidence that another concern used a similar construc-
tion, is inadmissible.                                    p. 432

In an action for damages by a railroad employee against the
railroad for injuries claimed to have been received by the rail-
road's negligence, prayers involving the construction by the jury
of the defendant's rules are erroneous.                   p. 433

*Decided January 6th, 1915.*

Appeal from the Circuit Court for Washington County.
(HENDERSON and KEEDY, JJ.)

The plaintiff, a brakeman on the B. & O. R. R., was
permanently injured by falling in a cinder pit in one of the
company's railroad yards,—while going across the yard at
night for a drinking cup, for the use of the engine crew of a
train being prepared to engage in interstate commerce; the
verdict was for $5,300, and the defendant appealed.

*Plaintiff's First Prayer*—The plaintiff by his counsel,
prays the Court to instruct the jury that if they find from
the evidence that the defendant, the Baltimore and Ohio
Railroad Company, was and has been since the 23rd day of
June, 1913, a corporation duly incorporated under the Laws
of Maryland, and further find that upon the 23rd day of
June, 1913, the defendant was a common carrier by railroad
engaged in carrying freight from the said State of Maryland,
in and to the State of West Virginia, and further find that
on the 23rd day of June, in the night time of the morning,
the day and year aforesaid, the plaintiff, Harvey W. C. Whit-
acre, was employed by the said defendant railroad company
as a front brakeman, and in the discharge of his duties as
front brakeman in the defendant's railroad yards at or near
the city of Cumberland, Maryland, and assisting in prepar-
ing and getting ready one of the defendant's engines and
trains to carry and transport freight from the said city of
Cumberland, in the State of Maryland, to Cumbo Yard, in

the State of West Virginia, and further find that while the said Harvey W. C. Whitacre was so employed by the defendant as a brakeman on said train, and acting within the scope of his employment as such brakeman, if they so find, he got off the engine and was walking across said yard in the discharge of his duties as such brakeman to said train, in the darkness of the night time, and fell into a cinder pit and was injured, and that said cinder pit was negligently maintained then and there by the defendant, (*unlighted and without guards and in such condition that the water and ashes concealed said pit*) and that said cinder pit was one of the appliances, works or equipment maintained by the defendant, and that said injury was due in whole or in part to the negligence of the defendant in (*so*) maintaining its said appliance, works or equipment (*as aforesaid*), then the plaintiff is entitled to recover in this action, and the verdict of the jury must be for the plaintiff (*unless the jury shall further find the facts set forth in the defendant's tenth prayer*). (*Granted as modified.*)

*Plaintiff's Second Prayer*—The plaintiff further prays the Court to instruct the jury that if they find a verdict for the plaintiff and in so finding they believe from the evidence that the accident was due entirely to the negligence of the defendant, and that the plaintiff in no manner contributed to the accident by any negligence of his own, then in estimating damages the jury are to consider the health and condition of the plaintiff before the injuries complained of as compared with his present condition in consequence of such injuries, and whether the same are in their nature permanent, and how far they are calculated to disable the plaintiff from engaging in those business pursuits for which, in the absence of such injuries he would have been qualified; and also the physical and mental suffering to which he has been subjected by reason of said injuries, and the jury are to allow such damages as in their opinion will be a fair and just compensation for the injuries suffered. (*Granted.*)

*Plaintiff's Third Prayer*—The jury are instructed that if they find a verdict for the plaintiff, and in so finding believe from the evidence that the accident was caused in part by the negligence of the plaintiff, and in part by the negligence of the defendant, the negligence of both contributing to cause the accident, then in estimating the damages they must subtract from the total damages they may find the plaintiff suffered, calculated according to the plaintiff's second prayer, such sum as they may believe from the evidence was proportionate to the amount of negligence attributable to the plaintiff in the causing of the accident, that is to say, for illustration: If the jury find that plaintiff and defendant's negligence were equally efficient causes in producing the accident, then the jury can allow the plaintiff only one-half of the damages they may find he actually suffered by reason of the accident, calculated according to the plaintiff's second prayer, or if they find that the plaintiff's negligence was one-fourth, and the defendant's three-fourths of the total negligence, producing the accident, then the jury can allow the plaintiff the amount of damages they may find he suffered, calculated in accordance with the plaintiff's second prayer, less the one-fourth attributable to him; or if they find the plaintiff's negligence was three-fourths and the defendant's one-fourth, of the total negligence producing the accident, then the jury can allow the plaintiff the amount of damages they may find he suffered, calculated in accordance with the plaintiff's second prayer, less the three-fourths attributable to him, and so on for any other proportionate negligence the jury may find, the above figures being used only for illustration. (*Granted.*)

*Defendant's First Prayer*—The defendant prays the Court to instruct the jury that, under the pleadings in this case, there is no evidence legally sufficient to entitle the plaintiff

to recover, and their verdict must be for the defendant. (*Rejected.*)

*Defendant's Second Prayer*—The jury are instructed that, in order to find a verdict for the plaintiff, they must find from the greater weight of the evidence that the plaintiff was injured while engaged in some act within the scope of his employment, which had some real, (*or*) substantial (*relation to interstate*) traffic over defendant's railroad.   (*Granted as modified.*)

*Defendant's Third Prayer*—The defendant prays the Court to instruct the jury that, under the pleadings in this case, there is no evidence legally sufficient to enable the jury to find any negligence on the part of the defendant, which contributed to the injury complained of, and their verdict must be for the defendant.   (*Rejected.*)

*Defendant's Fourth Prayer*—The jury is instructed that, if they find that cinder pits of similar construction to the cinder pit of the defendant mentioned in the evidence are usually and generally constructed by railroad companies without guard rails or barriers at or near the sides thereof, then the jury cannot find any negligence upon the part of the defendant from the fact that there were no guard rails or barriers at or near the sides of the cinder pit of the defendant mentioned in the evidence, if the jury shall so find. (*Rejected.*)

*Defendant's Fifth Prayer*—The jury is instructed that, even if they find from the evidence that the cinder pit mentioned in the evidence was dangerous or unsafe, they cannot find for the plaintiff, unless they further find that the defendant was guilty of negligence in either the method of construction of the said cinder pit or in the maintenance or operation thereof and that such negligence, if the jury shall so find, contributed to the injury complained of.   (*Granted as modified.*)

*Defendant's Sixth Prayer*—The jury are instructed that there is no legally sufficient evidence in this case that the

plaintiff was injured while he was employed by the defendant in interstate commerce and their verdict must be for the defendant. (*Rejected.*)

*Defendant's Seventh Prayer*—The jury are instructed that the burden of proof is on the plaintiff in this case to show by the greater weight of the evidence that some definite act of negligence of the defendant was the primary and proximate cause of the injury complained of. (*Rejected.*)

*Defendant's Eighth Prayer*—The jury are instructed that, if they find from the evidence that the plaintiff at the time and place, when and where he suffered the injury complained of, was in the employment of the defendant, and that he was directed by the fireman on the engine mentioned in evidence, if the jury shall so find, to hunt up the tool boy and get a tin cup from him for the use of the crew on said engine, if the jury shall so find, and that the plaintiff, in compliance with such direction of said fireman, left his engine and walked about the yard of the defendant looking for said tool boy, to get said cup, if the jury shall so find, and, while so doing, walked or fell into the cinder pit mentioned in evidence, if the jury shall so find, and was injured, yet their verdict must be for the defendant, unless they further find that the said fireman had authority to give such direction to the plaintiff and that the plaintiff acted upon such direction and not upon his own volition, and the jury are further instructed that there is no evidence in this case legally sufficient to establish that the fireman had authority to give such order or direction, unless they shall find that the engineer was absent from the said engine and left the same in charge of the said fireman. (*Rejected.*)

*Defendant's Ninth Prayer*—The defendant prays the Court to instruct the jury that, if they find from the evidence that the construction of the cinder pit in the eastbound yard of the defendant, referred to in the evidence was completed and put in operation on or about January 1st, 1913, and was of modern design and well constructed, and

was maintained and operated as cinder pits are usually and generally maintained and operated by railroads, and that the plaintiff, before the injury complained of in this suit, had been employed by the defendant as a brakeman, running in and out of the said east-bound yard of the defendant, for three years next preceding said injury, and during the time of the construction of said cinder pit, and saw the progress of the work thereon, and well knew the location, character and design of said cinder pit, from having seen the same many times, then the plaintiff assumed the risk and danger of falling into said cinder pit, and their verdict must be for the defendant even if they further find from the evidence that said cinder pit was not protected by guard rails or other barriers on the sides thereof and that the plaintiff fell into said cinder pit and was injured. (*Rejected.*)

*Defendant's Tenth Prayer*—The defendant prays the Court to instruct the jury that, if they believe from the evidence that the cinder pit referred to in evidence was constructed by the defendant, in its east-bound yard after such design and according to such plan as is generally employed by railroad companies reasonably and prudently managed in the construction of such pits (*under similar conditions*), and that such pit was a necessary part of the equipment of the defendant, and was maintained and operated in the same way as such railroads generally maintain and operate such pits (*under similar conditions, as aforesaid*), and that said cinder pit could not be properly and effectually maintained and operated for the purpose for which it was designed, with guard rails on one or both sides thereof, and that said cinder pit was lighted by four arc electric lights (*at the time of the accident*), and that its construction, location and maintenance were well and fully known by the plaintiff, (*and that all the conditions surrounding the plaintiff were then and there such as to enable any one in the possession of his faculties walking in said yard in the immediate vicinity to recognize his whereabouts with reference to said pit and to see the pit*

*by the exercise of ordinary care on his part*), then the construction, maintenance and operation of said cinder pit, without guard rails or other barriers, on either side thereof, was not negligence on the part of the defendant, and their verdict must be for the defendant, even though the jury may further find that the plaintiff fell into said cinder pit and was injured because it was not protected on the sides by guard rails or barriers. (*Granted as modified.*)

*Defendant's Eleventh Prayer*—The jury are instructed that, if they find from the evidence that when the plaintiff entered into the service of the defendant and remained therein, after the construction and operation of the cinder pit mentioned in the evidence, if the jury shall so find, with knowledge of the location and construction of said cinder pit, with relation to the position of his engine spoken of in evidence on the night of the accident, the plaintiff assumed all the natural and ordinary risks and perils of his employment by the defendant as a brakeman in and about said yard, and the risk of falling into said cinder pit, and the plaintiff cannot recover for any injury which the jury may find he sustained by falling therein. (*Rejected.*)

*Defendant's Twelfth Prayer*—The jury are instructed, if they find from the evidence that the plaintiff had been in and out of the yard of the defendant in the neighborhood of the cinder pit in mentioned evidence as many as twenty times or thereabouts, in the day time, and once at night, between the time when the said cinder pit was put in operation, about January, 1913, and the date of the accident, June 23, 1913, if the jury shall so find, that then the plaintiff had ample opportunity to ascertain and know the location of said cinder pit, with reference to the track on which his engine stood on the night of the accident, and to know that said cinder pit was not protected at the sides by railings or barriers, of any kind, and the jury are further instructed that then the danger of falling into said pit was one of the risks or perils of the

employment of the plaintiff, which he assumed in entering into said employment and remaining therein after he had such knowledge of the location and condition of said pit or such opportunity of acquiring such knowledge, and their verdict must be for the defendant. (*Rejected.*)

*Defendant's Thirteenth Prayer*—The jury are instructed that the rules of the defendant company, offered in evidence, did not give the fireman of the crew of engine No. 4153 authority to order or direct the plaintiff as brakeman to go after the tool boy and get a tin cup for the use of the crew of said engine. (*Rejected by a divided Court—Keedy, J., for: Henderson, J., against granting instructions.*)

*Defendant's Fourteenth Prayer*—The jury is instructed that, under the pleadings in this case, they cannot find for the plaintiff, unless they find from a preponderance of all the evidence that the fireman of engine No. 4153 ordered or directed the plaintiff to procure a tin cup for the use of said engine and shall further find that, under the rules or regulations of the defendant in force at that time, the said fireman then and there had authority to give such order or direction to the plaintiff and that it was the duty of the plaintiff to obey such order or direction of the fireman, if they shall find the said fireman gave such order or direction. (*Rejected.*)

*Defendant's Fifteenth Prayer*—The jury is instructed that, under the pleadings in this case, there is no evidence legally sufficient to entitle the plaintiff to recover damages for any alleged unskillful or improper treatment of the injuries alleged to have been sustained by him. (*Granted.*)

*Defendant's Sixteenth Prayer*—The jury is instructed that there is no evidence in this case legally sufficient to enable them to find that the fireman of engine No. 4153 had any authority to give any direction or order to the plaintiff or that the plaintiff was required to obey any alleged order of the said fireman, unless they shall find that the engineer of the said engine was absent from the said engine at the

time the order is alleged to have been given and said fireman was then and there in charge of the said engine.  (*Granted.*)

*Defendant's Seventeenth Prayer*—The jury is instructed that if they find that the rules and regulations of the defendant offered in evidence from rule book No. 10367 were in force and effect at the time of the happening of injury complained of and that the rules and regulations as contained in Rule Book No. 722 were not in force and effect at the said time, then there is no evidence in this case legally sufficient from which they can find that the fireman of engine No. 4153 had any authority to give any order or direction to the plaintiff to procure a tin cup for the use of the crew of said engine.  (*Rule Book No. 10367 having been withdrawn by counsel for plaintiff, with leave of Court, the above prayer is rejected.*)

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*George A. Pearre* (with whom was *H. H. Keedy* on the brief), for the appellant.

*Albert A. Doub* (with whom were *Charles D. Wagaman* and *Frank A. Perdew* on the brief), for the appellee.

STOCKBRIDGE, J., delivered the opinion of the Court.

This Court is now called upon, for the first time, to apply in an action to recover for personal injury the provisions of the Act of Congress of April 22nd, 1908, Chap. 149, entitled "An Act Relating to the Liability of Common Carriers by Railroad to Their Employees in Certain Cases." The special importance lies in the fact that under that Act the established rules of the common law with regard to contributory negli-

gence, negligence of a fellow-servant and assumption of risk were radically modified.

The case presented brings up for review the rulings of the trial Court upon demurrers to the declaration, forty-six exceptions reserved to the admission or rejection of evidence, and one to the action of the Court upon the prayers. It will not be necessary, however, to consider each one of these in detail, four of the bills of exception, the fifth, seventeenth, fortieth and forty-third, having been abandoned by the counsel for the appellant in his brief, and the large proportion of the others will be sufficiently dealt with in an expression of the views of this Court upon the Act in question, as applied to this particular case.

The important facts in the case are as follows: Harvey W. C. Whitacre had been for several years an employee of the Baltimore and Ohio Railroad Company as a brakeman, and at the time of the happening of the accident in question, June 23rd, 1913, was what is known as front brakeman on a freight train, having a run from Cumberland, in the State of Maryland, to the Cumbo Yards, near Martinsburg, in the State of West Virginia. The railroad was at the time a common carrier, engaged in doing interstate business, and the employment of Whitacre was in the conduct of interstate business. On the morning of the day named, Whitacre was called about 1 o'clock, with orders to join a train in his capacity of brakeman, which was to leave Cumberland at 2 o'clock. In response to that call, at or about the appointed time, he reported at the caller's office, and then proceeded through the yard of the railroad company to join the engine, which was to be coupled to the train at the Evitts Creek Yard, some half-mile distant. The locomotive was then standing upon a "ready track," and as the brakeman approached it he did not see the engineer but did see the fireman, and Whitacre put on his working clothes. He then inquired of the fireman whether he was ready to start, and he received the answer, "No, not quite." "The tool boy had

not been there and had left him no tin cup, and he asked me
to go and hunt the tool boy and get a tin cup." This is the
testimony of the plaintiff himself. The fireman's version
differs somewhat. Acting upon what the plaintiff under-
stood to be the order or request of the fireman, he did start
to look for the tool boy and tin cup, and saw at a little dis-
tance a moving light, which he followed, supposing it to be
a lantern in the hands of the tool boy. Suddenly the light
disappeared around some object, subsequently ascertained
to be an engine. The plaintiff then took a few steps back-
ward and fell into a cinder pit, which was near the center of
the yard, and used for the purpose of raking the cinders into
from the firepan of the locomotive. This cinder pit was of
large size, approximately 180 feet in length by 50 feet in
breadth, and varying in depth from 3½ to 9 feet. It was of
recent construction, having been in use but about six months,
and was what is known as a water pit as distinguished from
a dry pit. There was no railing around the pit, but at or
near the center it was spanned by iron or steel beams, upon
which was worked a travelling crane, that was used in the
daytime for the removal of cinders from the pit. The alle-
gations contained in the declaration, and borne out in the
testimony, were to the effect that it had been raining; that
the night was somewhat thick and foggy, and that the top
of the water in the pit was covered to a greater or less extent
with ashes, which made it difficult, if not impossible to
distinguish it in appearance from solid ground. When the
plaintiff fell into the pit he was wetted up to his waist, and
fell across an iron bar or rail, but clambered out, returned
to his engine without the tin cup, and the engine proceeded
to the Evitts Creek Yard, where it was attached to the cars
to be hauled to the Cumbo Yard. The plaintiff performed a
portion, if not all, of his regular duties as brakeman, which
involved getting down and coupling and uncoupling the air
pipes between the tender of the engine and the front freight
car. This operation was repeated several times between

Cumberland and the Cumbo Yard. He did, however, while on the trip complain of his accident to the conductor of the train, and an accident report was made out at Hansrote, one of the intermediate stations. From the Cumbo Yard the plaintiff returned to Cumberland on a passenger train. The following day he consulted a physician, who after examining him found a rupture for which an operation was performed, and from which he recovered. After some months the plaintiff complained of pain in his spine, for which he was treated by applying a white hot iron; and still later there developed what was claimed to be a fracture of the bone of the thigh containing the socket, with which the head of the femur articulates. These are in substance the injuries to recover for which the suit was brought. Some others were set out in the declaration, but not substantiated by the proof.

The declaration in its various counts charges negligence, negligence in the omission to supply the tin cup, negligence in the construction and maintenance of the cinder pit, and inferentially negligence in allowing the ashes deposited in the cinder pit, or some portion of them, to obey the laws of gravitation, and float on the top of the water.

The grounds upon which liability is denied by the defense are, absence of negligence upon the part of the railroad company, both as to the tin cup and the construction of the pit; secondly, that the risk, if risk there was, was one assumed by the plaintiff when he entered upon the employment. and it was further urged that in leaving the engine and going to look for the tool boy, the plaintiff was doing an act not materially or directly connected with interstate commerce, and that, therefore, the Act of Congress had no application.

The first question to be answered is as to the applicability of the Act of Congress. It is difficult to reconcile the various decisions, even to reconcile those of the same Court. A few propositions, however, are clear. These are, that the Act was intended to apply only in *certain cases,* thus recognizing that there was a class of cases which might arise between a

common carrier by railroad and its employees, in which the Act had no applicability. This was distinctly recognized in the case of the *Illinois Central R. R. Co.* v. *Behrens,* 233 U. S. 473, in an opinion by JUSTICE VAN DE VANTER, and is further emphasized by section 1 of the Act: "This clause has two branches; the one covering the negligence of the officers, agents or employees of the carrier * * *, and the other relating to the defects and insufficiencies in the cars, engines, appliances, etc." But plainly with respect to the latter, as well as the former ground of liability, it was the intention of Congress to base the action on negligence only, and to exclude responsibility of the carrier to its employees for defects and insufficiencies not attributable to negligence * * *. To hold that under the statute the railroad company's liability for the injury or death of an employee resulting from any defects or insufficiencies of its cars, engines, appliances, etc., however caused, is to take from the Act the words "due to its negligence." The plain effect of these words is to condition the liability upon negligence." And in any given case the measure of the responsibility of the carrier is that of ordinary care. *Seaboard Air Line* v. *Horton,* 233 U. S. 501.

The argument and brief of the railroad company devoted much attention to the question of primary negligence; but under the wording of the Act this contention can not be held sound; if there was *any act* of negligence upon the part of the railroad company, then even though there was contributory negligence upon the part of the plaintiff, or of a fellow servant, and the plaintiff was, at the time of the happening of the accident, engaged in interstate commerce, and there had been no assumption of the risk upon his part, then the Act must be held to apply.

That the plaintiff must be regarded as being engaged in interstate commerce at the time of the happening of the accident seems conclusively settled by two cases. In the *P., B. & W. R. R. Co.* v. *Tucker,* 35 App. D. C. 123, subsequently

affirmed *per curiam* by the Supreme Court, Tucker was killed
by being struck by an engine when he was on the premises
of the defendant, in response to its call to assume the duties
he had been engaged by the defendant to assume for their
mutual interest and advantage; and it was there laid down
that the obligation of the master commences when the servant,
in pursuance of his contract with the master, is rightfully
and necessarily upon the premises of the master.   In the
*No. Car. R. R.* v. *Zachary,* 232 U. S. 248, it was held that
the acts of an employee in preparing an engine for a trip
to move freight in interstate commerce, although done prior
to the actual coupling-up of the interstate cars, are acts done
while engaged in interstate commerce.   In this latter case
the party for whose death the action was brought was a fire-
man on a locomotive of the Southern Railway, he had pre-
pared his engine for the trip and was crossing the railroad
yard from his engine to go to his boarding-house; and had
passed behind one locomotive, when he was run down by a
switching engine on an adjoining track.   Certainly the act of
the fireman in going to his boarding-house was no more an
act connected with interstate commerce than was the act of
Whitacre in hunting for a tool boy in order to obtain a tin
cup for the use of the crew on its trip.

An endeavor was made in the evidence to predicate the
act of negligence of the company upon the failure of the
tool boy to supply the locomotive with a cup, an attempt
which was but partially successful as it was not satisfactorily
shown that the tin cup was an absolute essential to the move-
ment of the train, which in fact did move without it, and the
evidence of the fireman tended rather to show that even if it
had been present, its use, according to individual taste, might
have been dispensed with in favor of the lid of the water
cooler.

In the prayers which were offered at the conclusion of the
case, the tin cup as a negligent omission on the part of the
company seems to have been lost sight of, and the negligent

act relied on, at this stage, appears to have been the method of construction and maintenance of the cinder pit. There was a practical unanimity of evidence that the pit itself was admirably constructed according to the best modern engineering ideas of what such a pit should be, but the negligence claimed was of two descriptions: one, the insufficient lighting of the pit, in regard to which there was a conflict of evidence whether the electric lights which had been placed there were or were not burning at the time of the happening of the accident, so as to give a good illumination of the pit; and, second, that the pit was a dangerous appliance for the purpose for which it was designed and used, by reason of the absence of guard rails. Upon this phase also there was a conflict of evidence, that of the plaintiff in support of the dangerous character of the appliance, being the testimony of certain engineers in the nature of what is commonly spoken of as expert testimony.

Some of the exceptions to evidence go to the admissibility of this testimony, upon the theory that the dangerous character *vel non* of the pit as constructed without guard rails, and with water upon which the lighter portion of the ashes might float, was a matter so within the common, every-day knowledge of the average citizen that expert evidence was inadmissible. With that contention this Court can not agree; the construction of railroad cinder pits is not a matter with which the average individual is so brought in contact in his daily life as to be necessarily familiar with what is and what is not practicable and proper, as to exclude evidence of an expert character. Furthermore, it appears that only a very small number of water pits have been built thus far in this country. How they may compare with dry pits in the element of danger is known to but few and is clearly without the range of the ordinary experience of the individual. It was, therefore, proper to admit this evidence, as was done, and there was thus raised by the testimony a distinct issue.

as to the negligence of the defendant, the railroad company, in the construction and maintenance of the pit.

Did the plaintiff, Mr. Whitacre, assume this risk? The rule has been frequently laid down, both in this State and elsewhere, upon this subject, and is well stated in the case of *Wood* v. *Heiges,* 83 Md. 257, that a person assumes all risk of all dangers which are open and obvious, but not dangerous which arise from the negligence of the master, unless after knowledge of such danger the servant continues with full knowledge to perform his work. The rule was given its fullest application in the *Seaboard Air Line R. R.* v. *Horton,* 233 U. S. 492, where the guard glass over the boiler gauge in the cab of a locomotive was missing, and was reported as missing by the engineer to his superior seven or eight days before the happening of the accident, and though the missing guard glass was not supplied, the engineer continued to run his engine, and was injured by the bursting of the gauge, and the engineer was held, by continuing to work without the replacement of the guard glass, to have assumed the risk incident to its absence. And a similar case is that of *Byers* v. *The Coal* Co., 230 Pa. 10; although in this latter case the Act of Congress was in no way involved. See also *So. Ry. Co.* v. *Crockett,* 234 U. S. 730. In the case under consideration the plaintiff had been into the Cumberland Yard in connection with his work on a number of occasions; certainly once at night, and knew or must have known of the existence there of the cinder pit; but the performance of his duties was not at the cinder pit, nor was he necessarily placed in the position with relation to it where he must be construed by law to have known whether it was a dangerous appliance or not, and he had the right to assume, that as constructed it was a proper and safe appliance. Upon this branch of the case the Act of Congress has no application, because section 4, by its terms, applies only in a certain class of cases, of which this is not one, and if we take the rules as applied in the State Courts, the risks which are assumed by an employee

are those incident to, or connected with, the work which the employees perform, not those which may exist in other portions of the establishment or yard where he himself has no duties and where he has the right to rely upon the master's having performed his entire duty.    In the case of *McCann* v. *Alt. Mills,* 20 R. I. 566, relied upon by the appellant, and which is the case most nearly approaching this in its facts, the Court did say that, "It was the duty of the employer to furnish his employees drinking water, but the fact that it was not so furnished does not warrant the plaintiff in wandering about the yard in the darkness in search of it, at any one's risk except his own;" the Court, however, in deciding the case places its decision not upon the assumption of risk, but of the contributory negligence of the plaintiff.    So in this case, the act of the plaintiff in going about the yard as he did, was one to be viewed rather as contributory negligence than an assumption of risk, and that aspect of the case was fully and properly covered by the plaintiff's third prayer.

From what has been said, it follows, that no reversible error is found in the rulings of the trial Court upon the demurrer to the declaration, or the 1st, 2nd, 3rd, 4th, 9th, 10th, 18th, 19th, 20th, 21st, 22nd, 25th, 27th, 30th, 31st, 32nd, 33rd, 34th, 35th, 36th, 37th, 38th, 39th, 42nd and 46th exceptions to evidence.    The 7th exception was to permitting the plaintiff to testify with regard to promotions in the service; at best the question was immaterial, and no injury has been pointed out or is apparent from the admission of that evidence by the Court.

The eighth exception was to the exclusion upon cross-examination of the plaintiff of the question, whether his wife had died of tuberculosis.    This was also immaterial to any issue raised in the case.

The eleventh and twelfth exceptions were taken to the admission by the Court of the evidence of an insurance expert, in giving from his tables the value of an income, such as the plaintiff was receiving at the time of the accident.    This evi-

dence was of course intended as a guide for the jury in determining the proper amount of damages to be awarded. Without some evidence in regard to this before the jury, there was no basis except vague speculation on which to base any verdict. The insurance tables of expectancy, based upon actual experience of the large life insurance companies, while not conclusive, have been recognized to be the best character of evidence obtainable for such purposes, and the evidence objected to by these two exceptions was properly admitted.

This is quite different from the objection raised in the 44th exception where the Court refused to permit a physician to express his opinion upon the prospect of the life of the plaintiff; there had been nothing to show upon what any such opinion might be formed, whether it was the result of professional observation from long years of continuous practice, or upon the occupation of the plaintiff, or what circumstances he might or might not have considered in reaching his opinion, and the Court acted properly in excluding his evidence.

The 13th, 14th, 15th and 16th exceptions all related to the taking of an X-ray photograph of the hip bone, which was claimed to have been fractured, whether the angle at which taken would or would not tend to disclose or conceal any such fracture. Evidence had been given by physicians of the fact of fracture, discovered by manipulation, but the use of photography in cases of this character is now so universally recognized, that it is properly regarded as evidence of the strongest sort in any such case, and yet, as is well known the lights or shadows produced by the angle of light may make a material difference in the appearance; it was, therefore, entirely proper that the witness should be fully examined upon this point. There were a number of other exceptions to evidence, and while with regard to some of them the correctness of the ruling of the Court is not as clear, none of them disclose such injury to the plaintiff as to justify a reversal.

The last exception was to the rulings of the Court upon
the prayers; of these three were offered on the part of the
plaintiff, and seventeen upon the part of the defendant.

The plaintiff's first prayer, submitted to the jury, in the
form in which it was modified by the Court, the question of
the negligence of the railroad company, and as modified when
taken in connection with the defendant's tenth prayer, fully
placed before the jury the issue of negligence upon the part
of the defendant as an essential element to the recovery, and
is not open to the criticism suggested by the defendant.

The plaintiff's second prayer was the customery prayer as
to the measure of damages, and the third prayer was upon
the apportionment of damages between the plaintiff and de-
fendant, with respect to the finding of the jury as to negli-
gence and contributory negligence, in strict accordance with
the Act of Congress. While this prayer is a new one in this
State, yet it seems to have been drawn with peculiar care,
and is not open to objection.

The first and third prayers of the defendant were prayers
to take from the jury. But since there was some evidence
tending to show negligence on the part of the Railroad Com-
pany they were properly rejected. The defendant's fourth
prayer was to the effect, that if the pit in question was con-
structed in a similar manner to those constructed by other
railroad companies, that then the jury could not find any
negligence in its construction. This was manifestly a bad
prayer. The Court was not concerned with the question
whether other railroads were or were not negligent in their
appliances, but whether the Baltimore and Ohio was, and the
mere fact that the mode of construction followed that done
by another company, and which may or may not have been
a safe and proper appliance, could form no basis to relieve
the Baltimore and Ohio Company from liability in case the
jury found negligence in the construction and maintenance
of this pit.

The defendant's fifth prayer was granted with a modifica-
tion; but what that modification was is not indicated in the

record, and the reading of the prayer does not disclose anything in it which could operate to the disadvantage of the defendant.

The defendant's sixth, seventh, eighth, ninth and eleventh prayers have been sufficiently covered by what was said in the general discussion of the case and need not be further considered.

The defendant's twelfth prayer was properly rejected because the tenth prayer, which had been granted with modifications, sufficiently covered the same matter, and the granting of it would have tended to confuse the jury.

The thirteenth, fourteenth and sixteenth prayers of the defendant all involve a construction by the jury of the rules of the company, and therefore were properly refused, such construction being a matter for the Court and not for the jury.

The seventeenth prayer of the defendant was based in part upon certain rules of the company which had been offered in evidence and subsequently withdrawn, and being withdrawn from evidence no prayer could properly be granted, which involved a consideration of that which was not in the case.

Finding no reversible error, the judgment appealed from will be affirmed.

*Judgment affirmed, with costs.*