SUN CAB COMPANY, INC., ET AL. *v.* RICHARD B. WALSTON, ETC. ET AL.

[No. 542A, September Term, 1971.]

* * *

CURTIS LEE ASH *v.* JOHN R. JEWELL

[No. 542B, September Term, 1971.]

*Decided April 17, 1972.*

114

116

118

The cause was argued before MURPHY, C. J., and MOR-
TON, ORTH, THOMPSON and POWERS, JJ.

*Matthew Swerdloff* and *Edward P. Murphy*, with whom
were *Jay E. Levy, Allen B. Rabineau* and *Swerdloff, Ra-
bineau & Murphy* on the brief, for appellants in Nos.
542A and 542B.

*Melvin J. Sykes*, with whom were *Richard T. Rombro,
Joseph H. Omansky* and *Wartzman, Rombro, Rudd &
Omansky* on the brief, for appellees in No. 542A.

*J. Edward Martin, Jr.*, with whom were *Donald C.
Allen* and *Allen, Thieblot & Alexander* on the brief, for
appellee in No. 542B.

POWERS, J., delivered the opinion of the Court.

A few minutes after 1:00 P.M. on July 28, 1967, Mrs.
Dorothy A. Walston entered a taxicab owned by Sun
Cab Co., Inc. and operated by Curtis Lee Ash, on Edmon-
son Avenue, in Baltimore. The cab headed east. About
300 feet east of Hilton Street, at a point where a raised
concrete median strip divided Edmondson Avenue, to sep-
arate eastbound and westbound traffic, the cab crossed
the median strip and collided with a westbound truck,
operated by its owner, Wilton Ernest Moore. His 17 year
old son, James Moore, was a passenger in the truck.

Mrs. Walston was killed. Mr. Ash and both of the
Moores were injured.

Suit claiming damages for wrongful death was filed
against Sun Cab and Ash by Richard B. Walston, sur-
viving husband of Dorothy Walston, and by her six chil-

dren, whose ages at the time of her death ranged from just under three to not quite twelve. A claim by Mr. Walston as Administrator was included. Mr. Moore and his son in separate cases sued Sun Cab and Ash. In the son's case, Mr. Moore was next friend, and individually asserted his derivative claim. Mr. Ash, with leave of court, sued the Commissioner of Motor Vehicles, and by later amendment, added the Unsatisfied Claim and Judgment Fund Board, as stand-ins for an unidentified driver of another vehicle alleged to have been involved.

The four cases were consolidated, and tried before a jury and Judge Joseph C. Howard in the Superior Court of Baltimore City. Trial began on February 9, 1971, and was concluded with the jury's verdicts on February 23, 1971. In the suit of the Walstons against Sun Cab and Ash the verdict was for the plaintiffs. Damages were assessed in favor of the Administrator at $1,000.00; in favor of the surviving husband at $125,000.00; and in favor of the six children at $100,000.00 each. In the suit of Ash against the Unsatisfied Claim and Judgment Fund Board the verdict was for the defendant. In the suit of Wilton E. Moore against Sun Cab and Ash the verdict was for the plaintiff and damages were assessed at $14,500.00. In the suit of James Moore against Sun Cab and Ash the verdict was for the plaintiffs. Damages were assessed at $1,500.00 for James Moore, and at $205.-00 for his father's derivative claim.

Upon denial of motions for new trial and in arrest of judgment on July 30, 1971, judgments were entered in accordance with the verdicts. Sun Cab and Ash appealed from all judgments and from the order denying their motions in arrest of judgment.

We shall affirm the judgments in favor of Richard B. Walston, Administrator, the Unsatisfied Claim and Judgment Fund Board, Wilton E. Moore, and James Moore. The judgment in the wrongful death claim of the surviving members of the Walston family will be affirmed as to liability, but will be reversed in part, and remanded for a new trial on the question of damages.

Briefs filed in this Court by the various parties aggregate 257 pages. We allowed a total of four hours for oral argument. More than twenty contentions must be considered and decided. We shall recite additional facts as they are appropriate to the points being discussed.

Since our partial reversal is based upon an error in the damage instructions, we shall discuss that point first.

### Present Value of Future Losses As Damages in Wrongful Death Cases

"The General Assembly of this State, in the year 1852, finding the common law maxim, 'Personal actions die with the person', unsuited to the circumstances and condition of the people, enacted a law entitled 'An Act to compensate the families of persons killed by the wrongful act, neglect, or default of another person.' "

So said Chief Justice Bowie for the Court of Appeals in 1866 in the case of *Coughlan v. B. & O. R. R. Co.*, 24 Md. 84, at page 100. The act referred to, Laws of Maryland, 1852, ch. 299, patterned after Lord Campbell's Act in England, created a cause of action which did not exist at common law, designated the class of persons who could assert the cause of action, and provided that "* * * the jury may give such damages as they may think proportioned to the injury resulting from such death to the parties respectively for whom and for whose benefit such action shall be brought * * *".[1]

In *Coughlan* the Court of Appeals for the first time considered the measure of damages "proportioned to the injury resulting from such death" as provided for in the

---

1. The wording of the act as to damages remains unchanged to this day. From the first, the measure of damages was interpreted as limited to pecuniary losses. By Laws of Maryland, 1969, ch. 352 (not applicable to this case) the Legislature provided that as to certain classes of persons, damages shall not be limited to the pecuniary loss rule, but may include other kinds of damage. Other amendments to the section which is now Code, Art. 67, § 4, have enlarged the classes of persons who may assert the cause of action, and have extended the time within which the action must be commenced.

act. The appellant there, the mother of a minor son killed by a railroad car, objected to the damage instruction given by the trial judge because it confined her claim to pecuniary damages, and limited the pecuniary loss to the minority of the child. The Court compared and weighed the reasoning of the authorities, English and American, and found no error in the rulings of the court below.

At the same term, the Court in *B. & O. R. R. Co. v. Kelly*, 24 Md. 271, noted that "punitive damages are not recoverable in such a case as this, under the Act of 1852", and went on to say, at page 281:

> " 'It has been held, that these damages are not to be given as a *solatium*, but are to be given in reference to a pecuniary loss. It is also clear, that the damages are not to be given merely in reference to the loss of a legal right, for they are to be distributed among relations only, and not to all individuals sustaining such a loss. If then the damages are not to be calculated on either of these principles, nothing remains, except that they should be calculated in reference to a reasonable expectation of a pecuniary benefit, as of right or otherwise, from the continuance of the life.' In *Dalton v. R. R. Co.*, 93 Eng. C. L. 296, it was said 'that the reasonable expectation of pecuniary advantage by the relation remaining alive, may be taken into account by the jury, and damages may be given in respect of that expectation being disappointed, and the probable pecuniary loss thereby occasioned.' "

The measure of damages was articulated in more detail in a prayer approved by the Court in *B. & O. v. State, Use of Trainor*, 33 Md. 542 (1871) as follows:

> "If, under the instructions of the court, the jury should find for the plaintiff, then, in assess-

ing the damages, they are to estimate the reasonable probabilities of the life of the deceased, Trainor, and give the equitable plaintiffs such pecuniary damages, not only for past losses, but for such prospective damages as the jury may find that they have suffered, or will suffer, as the direct consequence of the death of the said Trainor; that for his children, these prospective damages may be estimated to their majority, and as to the widow, to such probability of life as the jury may find reasonable under the circumstances."

Instructions embodying the same principle were approved by the Court in *B. & O. v. State, Use of Woodward,* 41 Md. 268 (1875), *R. R. Co. v. State, Use of Bitzer,* 58 Md. 372 (1882), *Pikesville etc. R. Co. v. Russell,* 88 Md. 563, 42 A. 214 (1898), and many other cases.

A refinement of the stated measure of damages was made by the Court of Appeals in *Reisterstown Tnpk. v. State,* 71 Md. 573, 18 A. 884 (1889), when it approved a similar prayer, but said, at page 584:

"Although not perhaps as explicit as it might be, yet fairly interpreted it means, as we understand it, that in estimating the prospective damages to the widow, the jury are to take into consideration the reasonable probabilities of her life and the life of her husband, or, in other words, the probable duration of their joint lives. And as no objection was made to the instruction in this respect in the cases above referred to, nor any in the one now before us, we must assume the jury so understood it. It may be proper, however, to say, that in order to prevent any misunderstanding in regard to the matter in the future, it would be better and safer to say that in estimating the prospective damages to the widow the jury were to take into consideration the probable duration of their joint lives."

It was inevitable that the bench and the bar would develop as a further refinement, that damages to be realized periodically over a given period of future time, should be reduced to present value. Strangely, the principle seems to have crept into the law by common acceptance, for the Court of Appeals has never had occasion to rule squarely upon it. The earliest indication of its consideration is found in *Consol. Gas Co. v. Smith,* 109 Md. 186, 72 A. 651 (1909), where the Court used the present value rule to test the prejudicial effect of evidence, admitted over objection, that the widow had no property or means of support. The Court said, "The admission of such testimony is therefore irrelevant, in any case, and must tend to prejudice one of the parties in any event." But the Court went on to say, at pages 206 and 207:

> "But in the case before us the jury has, very clearly, successfully resisted the apprehended appeal to their sympathy, and have not permitted themselves to go beyond moderate compensation. The uncontradicted proof is that Smith was a young man about twenty-eight years of age, in perfect health, and earning $65 a month, or about $800 a year. The widow, in view of her husband's age, must have been a comparatively young woman, and the son was born after the father's death. The father's duration of life, calculated by any standard mortuary tables, would have covered the minority of the child, and the widow's expectation of life would have covered the same period at least. The total amount allowed the widow and child was $4,800. Assuming that this could have been permanently invested at six per cent. per annum, it would produce annually only about one-third of the annual earnings of the deceased, and that sum must be less than they would have received if he had lived, and is not adequate for

their proper food and clothing and shelter. If the principal were drawn on to supply the deficiency of income, it would be exhausted by the time the child reached majority, or even before he reached the age of labor sufficient to sustain himself. We cannot therefore find any evidence whatever that the verdict was influenced by the testimony admitted, and we would not be warranted in reversing the judgment for a technical error with no concurring injury."

The principle was recognized in *B. & O. R. R. Co. v. Whitacre*, 124 Md. 411, 92 A. 1060 (1915), but only from the standpoint of the evidence required for its application. The propriety of the rule itself was not in issue. The case did not involve a death, but a disabling injury. The Court said, at pages 430 and 431:

"The eleventh and twelfth exceptions were taken to the admission by the Court of the evidence of an insurance expert, in giving from his tables the value of an income, such as the plaintiff was receiving at the time of the accident. This evidence was of course intended as a guide for the jury in determining the proper amount of damages to be awarded."

The Supreme Court of the United States was required to rule squarely upon the point in 1916, in an appeal from the Court of Appeals of Kentucky which had affirmed the judgment of a trial court in a suit brought in the State court under the Federal Employers' Liability Act. The Kentucky courts had declined to apply the present value rule, and the Supreme Court reversed. *Chesapeake & O. R. Co. v. Kelly,* 241 U. S. 485, 60 L. Ed. 1117, 36 S. Ct. 630. At pages 489 and 490 the Court said:

"The damages should be equivalent to compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of the deceased.

(Citations omitted) So far as a verdict is based upon the deprivation of future benefits, it will afford more than compensation if it be made up by aggregating the benefits without taking account of the earning power of the money that is presently to be awarded. It is self-evident that a given sum of money in hand is worth more than the like sum of money payable in the future. Ordinarily a person seeking to recover damages for the wrongful act of another must do that which a reasonable man would do under the circumstances to limit the amount of the damages. (Citations omitted) and the putting out of money at interest is at this day so common a matter that ordinarily it cannot be excluded from consideration in determining the present equivalent of future payments, since a reasonable man, even from selfish motives, would probably gain some money by way of interest upon the money recovered."

Another recognition of the rule in a disabling injury case, where the rule itself appears to have been taken for granted, is found in *Baltimore Transit Co. v. Worth,* 188 Md. 119, 52 A. 2d 249 (1947). The Court of Appeals found no error in permitting an insurance company actuary to testify to the value, on the date of plaintiff's injury, of a life annuity, for a man of plaintiff's age, which would provide a weekly income of a stated amount. The objections raised were that plaintiff's name was not given in the question, and that the standard annuity tables the witness used were not explained to the jury. The Court held that the plaintiff's date of birth, given in the question, was sufficient reference to him, and that the average man knows what is meant by actuary tables. At pages 142 and 143.

The present value rule was again recognized as valid, although not an issue, and although its application in a specific question was rejected, in the wrongful death case

of *Scott v. James Gibbons Co.,* 192 Md. 319, 64 A. 2d 117 (1949). The Court said, at page 331:

> "It is the practice, to establish damages in a case like this, to prove joint life expectancy by an actuary who uses established mortality tables, and annuity tables, showing a sum of money that would produce an income equal to the loss occasioned by death."

The Court agreed that the lower court correctly sustained an objection to a question which included elements the Court considered improper.

One year later, in *Baltimore Transit Co. v. Castranda,* 194 Md. 421, 71 A. 2d 442 (1950), the Court discussed the measure of damages in a wrongful death case in which it is apparent that the question of reduction of future losses to present value was not raised. At pages 436 and 437 the Court said:

> "This Court has held that in any action brought under the statute for death caused by negligence, the jury may award damages for pecuniary losses which have already been sustained by the equitable plaintiffs and for pecuniary losses which they may probably suffer in the future as the result of the death. No damages shall be awarded as a solace for the grief or mental suffering of relatives of the deceased. (Citations omitted) In the case of the children of a person killed by negligence, the jury may estimate the prospective damages up to the time of their marriage or majority. The children may recover for the loss of the comforts, education, and position in society which they would have enjoyed if their father had lived and retained his income and they had continued to form part of his family."
>
> * * *
>
> "In awarding damages sustained by a widow

> for the death of her husband caused by negligence, the jury in estimating her prospective damages, should take into consideration the probable duration of the joint lives of herself and her husband if he had not been killed."

This was the state of the published law of Maryland when the United States Court of Appeals, Fourth Circuit, in *United States v. Guyer*, 218 F. 2d 266 (1954), a suit under the Federal Tort Claims Act for wrongful deaths and injuries which occurred in Maryland, said at page 268:

> "Under the law of Maryland the measure of recovery for wrongful death in a case such as this is the present value of the pecuniary benefit which the wife and children of the deceased might reasonably have expected to receive from him if he had not been killed."

The detailed mechanics of applying the present value rule are illustrated in the opinion of Judge Watkins as fact finder in the U. S. District Court in Maryland in *Jennings v. United States*, 178 F. Supp. 516 (1959). Judge Watkins stated the Maryland rule as to damages as given in *Castranda, supra,* but said, citing *Guyer, supra,* that such recovery is measured by the present value of the pecuniary benefits lost.

With one reference to the principle, in *B. & O. R. R. Co. v. Whitacre, supra,* in 1915, and one direct application of it, in *Baltimore Transit Co. v. Worth, supra,* in 1947, cases involving injuries, but not death, it does indeed appear that "reduction of damages to present value is not customary in Maryland except in cases of wrongful death", as the Court of Appeals observed in *Hutzell v. Boyer*, 252 Md. 227, 249 A. 2d 449. However, characterization of the rule as *customary* in wrongful death cases does not mean that it is any less the law in such cases, nor that a judge may properly decline to instruct the jury upon it when such instruction is requested.

Judge Howard properly instructed the jury, in accordance with *Baltimore Transit Co. v. Castranda, supra,* on the measure of damages sustained by members of the Walston family resulting from Mrs. Walston's death. In noting exceptions, counsel for Sun Cab and Ash contended that the damages for the family should first be considered as a unit, then allocated among the several plaintiffs. The judge restated, by way of review, the instruction he had given on allocation, and appellant's counsel then said, "I am not dissatisfied, but there is a point I think was omitted and I don't know, I think it's a valid exception as it then follows the point that you are instructing on. As a matter of law, you must then reduce that amount to its present value based upon a discount factor to be determined by you." The judge said that such an additional instruction was not required.

We hold that it was required, and that failure to give it was reversible error.

### Preliminary Questions

A. Reference in Opening Statement to Amount of Damages Claimed.

Sun Cab and Ash made a pretrial request that all counsel be instructed not to mention before the jury at any time during the trial the amount sued for. Whether to grant the request was in the trial court's sound discretion.

The Court of Appeals expressed itself clearly on this point in *Jimmy's Cab v. Isennock,* 225 Md. 1, pages 8 to 10, 169 A. 2d 425, reiterated in *Drug Fair v. Smith,* 263 Md. 341, at 354, 283 A. 2d 392. No more need be said. The trial court prefaced its advisory instructions with the explanation that opening statements and the closing remarks of counsel are in no way evidence in the case and should not be considered as such.

The request was denied. We find no abuse of discretion.

B. Voir Dire Questions to the Jury Panel.

Appellants submitted several questions which they desired to have asked of the jury on *voir dire*. All were asked but one. The rejected one was:

> "Has any member of this jury panel served as a juror prior to being called for jury duty with this present panel? If the answer is in the affirmative then:
>
> a. Has anything ever occurred in any prior case in which you served as a juror which would prevent you from fairly deciding the issues in this case?"

The purpose of *voir dire* examination of a jury panel, and the function and discretion of the trial judge have been fully discussed by the Court of Appeals in *Bryant v. State,* 207 Md. 565, at pages 581 to 583, 115 A. 2d 502, and *Casey v. Roman Catholic Archbishop,* 217 Md. 595, at pages 603 to 607, 143 A. 2d 627, and by this Court in *Phenious v. State,* 11 Md. App. 385, at pages 387 to 390, 274 A. 2d 658, and in other cases cited in those opinions.

Applying the principles laid down in those cases we find no abuse of discretion by the court in declining to ask the question quoted above.

Appellants also claim that four prospective jurors should have been disqualified for cause. The claim as to two of them is based upon Code, Art. 51, § 6 (b) (vii), which disqualifies a prospective juror who is a party in a civil suit pending in the court in which he is called to serve. In response to questions which were asked, one prospective juror said she had been injured in a car accident, and had a "claim pending", and another said he was a plaintiff in a pending case. There was no showing that either the claim or the case was pending in the court in which the jurors were called to serve. In addition, two other prospective jurors said they knew one of the attorneys in the case. Each said that this fact would not prevent rendering a verdict according to the evidence.

The judge did not excuse any of these four for cause. In any event, none of them sat on the jury in this case, and there could be no prejudice. 5A C.J.S., *Appeal and Error,* § 1708.

### Rulings on Evidence Relating to Liability

A. Testimony of Investigating Officer.

Officer Leon Gray, of the Accident Investigation Division of the Baltimore Police Department, was called as a witness by counsel for the Walstons. He was asked a series of questions tending to show that he was qualified by training and experience in investigation of motor vehicle accidents. Counsel for appellants cross examined the witness on his qualifications. The answers showed that the officer had also had experience and training in accident reconstruction.

When asked to rule upon the qualifications of the witness, the court ruled that Officer Gray was an expert in both investigation and reconstruction of automobile accidents. Appellants complain that the court erred in ruling that the witness was qualified as a reconstruction expert. This determination was within the discretion of the court, *Nizer v. Phelps,* 252 Md. 185, 249 A. 2d 112. That discretion was properly exercised. The point is academic, however, since Officer Gray was never called upon to express an expert opinion in either field.

Appellants further urge that the trial court erred in denying their motion to strike testimony of Officer Gray relating a statement he had heard from another police officer. In his direct examination the witness had been asked if there had come a time when he heard that the cab had been struck in the rear.[1a] Appellants' objection, on two stated grounds, was properly overruled. The officer answered that he heard it at the manslaughter trial, in the Traffic Court Building. In cross examination it

---

1a. It is apparent that this evidence was offered to show that the cab driver later fabricated an excuse for his actions.

was brought out that there were two separate hearings, one on a traffic charge and one on a manslaughter charge. Officer Gray attended one but not the other. He then corrected his earlier statement by saying that the information was related to him by his superior, a Sergeant Colburn. Appellants moved to strike the testimony on the point. The court reserved its ruling at that time, but later granted the motion, and so informed the jury.

Actually, the testimony need not have been stricken. The question being inquired into was not the ultimate fact of whether the cab had been struck from the rear, but whether Officer Gray had heard such a statement made, and if so, when. Neither his first answer nor the corrected version was hearsay. *McCormick on Evidence,* at pages 460 and 461, says the term "hearsay" should be limited "to situations where the out-of-court assertion is offered as equivalent to testimony to the facts so asserted by a witness on the stand. Only then does the want of such safeguards as cross-examination become material." In 2 *Jones on Evidence,* § 271, the author says:

> "If a statement previously made out of court is offered in evidence through a witness or a writing, not for the purpose of establishing the truth of the matter stated, but merely for the purpose of establishing the fact that the statement was made, the evidence is admissible, if it is relevant, and it is not subject to the exclusionary impact of the hearsay rule."

Error is also asserted in denial of appellants' motion to strike that part of the police officer's testimony concerning a causal connection between smooth tires and a wet road, and the accident. Appellees asked several questions designed to elicit such an answer, but appellants' objection to each was sustained, and appellees abandoned the point. As the court later said, "there was nothing to strike".

In the course of Officer Gray's direct testimony he stated that when he left the scene, he went to the Lu-

theran Hospital to talk to Mr. Ash, from whom he received the "license and information". The officer said he was "unable to take a statement" from Mr. Ash, "due to his injury and also to his company policy and instructions". When questioned by appellees' counsel, the officer further said that he saw a Mr. Kaufman at the hospital, and identified him as "with the insurance company" that insures Sun Cab Company.

Appellants' objections to this testimony were overruled. They assert error. The evidence was admitted as explanatory of the reason why Officer Gray took no statement from Mr. Ash, although he had taken statements from Mr. Moore and his son, and from the driver of a Cadillac which was struck by the cab after its collision with Moore's truck.

We think it was within the discretion of the court to admit the evidence for this purpose. As long ago as 1937 the Court of Appeals held in *Yellow Cab Co. v. Bradin,* 172 Md. 388, 191 A. 717, that a reference to insurance did not constitute prejudice when the reference was material, and that the jury was presumed to know that the law required taxicabs to be covered by public liability insurance. In *Rhinehart v. Lemmon,* (not reported) 29 A. 2d 279, the Court said that admissibility on any ground required admission, and material evidence was not to be suppressed because it suggested the possession of insurance. See also *Takoma Park Bank v. Abbott,* 179 Md. 249, 19 A. 2d 169, *Keitz v. National Paving & Contracting Co.,* 214 Md. 479, 134 A. 2d 296, and *Casey v. Roman Catholic Archbishop, supra.* The Court of Appeals spoke most recently on the question in *Snowhite v. State, Use of Tennant,* 243 Md. 291, 221 A. 2d 342. There Judge Barnes, writing for the Court, said, at page 301:

"Generally speaking, the law is well established that in an action to recover for personal injuries or wrongful death, evidence which informs the jury that the defendant is insured against liability is not admissible. * * * This

general doctrine, however, is not only subject to several well recognized exceptions but the modern trend is toward a relaxation of the rule."

In admitting this evidence, the court invited instructions with respect to its probative value. None was offered. There was no error.

### B. Impeachment by Appellant Ash of Testimony of Eye-witness Called By Him.

Appellant Ash called as a witness one William Mc-Cullough. He was examined on direct by counsel who represented Ash in his capacity as a plaintiff.[2] He said that on the day of the accident he was driving a Checker Cab east on Edmondson Avenue. He was in a lane to the right, so as to bear right on the ramp to Hilton Parkway. He saw a cab ahead of him in the left lane. He said a pick-up truck in the left lane passed him, and then he said:

> "It seemed like the truck was pushing the cab like on the bumper. I didn't see exactly whether it was on the bumper or not, but it seemed like it was pushing it and it cut away from it."

He said the pick-up truck then cut to the right in front of him and went down Hilton Parkway.

In cross examination of Mr. McCullough these questions and answers were recorded:

> "Q Did you actually see the pick-up truck

---

2. The court permitted cross examination on behalf of each party adverse to Ash, as well as examination by one of counsel representing Ash as a defendant, followed by redirect examination. Counsel representing Ash as a defendant insisted upon the right to ask leading questions, and generally to cross examine, because, he said, McCullough was "a witness called by the other side". Neither Mr. Ash nor any other party litigant can be thus bifurcated. Mr. Ash is Mr. Ash and his attorneys are his attorneys, regardless of the diversity of the issues affecting him in the trial. His attorneys may divide their areas of participation as they choose, but they act as one, and have the rights of one. They can under no circumstances take positions presenting an actual or even a potential conflict. The court, with the acquiescence of other counsel, gave Mr. Ash more latitude than he was entitled to have.

come in contact in any way with the rear of the taxicab?

A No, I didn't actually see it.

Q Then you don't know that it came in contact with the rear of the taxicab, do you?

A Not right offhand, I don't."

In redirect examination of the witness, counsel for Ash asserted a claim of surprise, saying that in a pretrial statement by the witness the version of the impact of the truck and the cab was different from his answers in cross examination. On that basis, he asked to be allowed to impeach his witness.

The court denied the request. The ruling was correct.

Circumstances under which a party may claim to be surprised by the evidence of a witness called by him, and what proceedings may thereafter take place, were discussed by the Court of Appeals in *Green v. State,* 243 Md. 154, 220 A. 2d 544, and *Mondawmin Corporation v. Kres,* 258 Md. 307, 266 A. 2d 8, and by this Court in *Vandergrift v. State,* 13 Md. App. 277, 282 A. 2d 528 and *Jenkins v. State,* 14 Md. App. 1, 285 A. 2d 667.

No further discussion of the law involving surprise by a witness is necessary. Indeed, the facts presented by this record are not within the application of the rule. When the court, in the broad discretion it has in such cases, permits use of a prior inconsistent statement by way of cross examination to impeach one's own witness, the sole purpose is to explain why the witness was called, and the maximum effect of showing the inconsistency is to nullify testimony already given by the witness in the trial. A prior inconsistent statement used to impeach a witness has no substantive probative value. *West v. Belle Isle Cab Co.,* 203 Md. 244, 100 A. 2d 17.

The reason why Mr. Ash called Mr. McCullough as a witness was sufficiently explained by his direct examination, with which counsel for Ash was apparently satisfied. Any inconsistencies developed thereafter were self-explanatory.

### C. Attempt to Impeach Testimony of Ash as a Witness.

Appellants assert there was error committed by the court when counsel for one of the appellees attempted to lay a foundation for impeachment of Mr. Ash as a witness by inquiring about a prior inconsistent statement. We have carefully examined the pertinent part of the transcript. The court overruled objections to several questions which appeared to be designed to lay the necessary foundation, but the answers of the witness were equivocal. Counsel apparently concluded that he had not established a proper foundation, since no impeachment was attempted. *Campbell, etc. v. Patton,* 227 Md. 125, 141, 175 A. 2d 761. There was no error in the court's rulings.

### D. Admissibility of Photographs.

Walston Exhibit 1a was a photograph of the taxicab, taken at the scene by a police officer on the day of the accident. Officer Gray identified it, and testified that it accurately represented the condition of the taxicab when he arrived at the scene. It was properly admitted in evidence. Thereafter the witness was shown a "blowup" of a part of Exhibit 1a. After examining it he answered in the affirmative that it was an accurate portrayal of the appearance of the right rear wheel and tire at the time of his investigation at the scene. The "blowup" was admitted in evidence over objection as Walston Exhibit 3.

Subject to certain general rules requiring that they be competent and material, the admissibility of photographs is largely within the discretion of the court. *Nocar v. Greenberg,* 210 Md. 506, 124 A. 2d 757; *Marlow v. Davis,* 227 Md. 204, 176 A. 2d 215; and *Sisk v. State,* 236 Md. 589, 204 A. 2d 684. There was no error in admitting Walston Exhibit 3 in evidence.

During cross examination of appellees' witness Raymond E. Hensley, appellants showed the witness a series of photographs, taken in August 1968, and asked him whether they represented the scene of the accident as it

existed on July 28, 1967. Generally, the witness answered in the affirmative, except that he said that the shrubbery, trees and bushes had been cut and trimmed at the time of the accident, and the condition shown in the photographs was different. The photographs were offered in evidence by appellants. Some were admitted without objection, some over objection. Objections to those identified as Sun Cab-Ash Exhibits 9a, 9b, 9c, 10a, 10b and 10c were sustained.

Later in the trial appellants called Richard J. Dunkerly as a defense witness. He testified that he was a laborer for the Bureau of Parks of the City of Baltimore, and that on the day of the accident, he was in charge of a crew of temporary summer employees, cutting and trimming grass in the vicinity of the intersection of Edmondson Avenue and Hilton Street. He said that his crew was not trimming trees and shrubbery. He did not see the accident, but was nearby, and went to the scene. The witness was shown Sun Cab-Ash Exhibits 9a and 9b, and said that each fairly represented the scene as it existed on the day of the accident. They were offered in evidence. Objections by appellees were sustained. In discussion at the bench, appellants also offered Sun Cab-Ash Exhibits 10a, 10b and 10c. All were excluded.

Appellants assert error. Whether to admit the photographs in evidence was clearly within the discretion of the court, and we find no error in their exclusion.

E. Evidence of Recollection of Contents of Unavailable Public Service Commission Inspection Report.

Realizing the need to counter testimony of Officer Gray, Charles L. Williams, and Raymond E. Hensley, and photographic evidence that the tires on their taxicab were smooth or bald, appellants undertook to do so by calling as witnesses a common carrier inspector and a supervisor employed by the Public Service Commission.

Hugh D. Stracham testified that he was a common carrier inspector for the Commission. When asked if he had any recollection of being at the Sun Cab Company

to inspect a vehicle in July, 1967 he said that he had not. He was withdrawn, subject to recall.

James W. Cramer, Transportation Supervisor for the Commission, testified that on July 28, 1967, shortly after the accident, he had inspected the taxicab involved, and that he had his report of that inspection. He said that this particular vehicle had been inspected on the premises of the Sun Cab Company four days earlier, on July 24, 1967, by Mr. Stracham. Mr. Cramer said that when he made his inspection after the accident, there were also present Mr. Stracham and a Mr. Konn, of the Commission, and two men from Firestone Tire and Rubber Company. He said that a tire gauge was used to measure the tread on the tires. Two of the tires were on the vehicle and two were off. He said his report indicated that there were no cuts or bumps in the tread. There was no minimum requirement at that time as far as treads were concerned. He was not present at the inspection made on July 24th, and did not know that the tires on the cab on July 28th were the same ones.

Mr. Cramer said that his report was kept in the regular course of business. It was marked for identification as Sun Cab-Ash Exhibit 16. It was never offered in evidence. With regard to Mr. Stracham's inspection of July 24, 1967, Mr. Cramer said of the regulations required in the inspection:

> "It's made to go to the color scheme, properly identified number and fleet, all the parts being on, such as the doors, windshield wipers, glass in windows, lights working front and rear, and muffler, and any other defects that are noticed. The tires would be inspected, naturally, to see if they had any defects that were noticed and that could be hazardous to the health, safety, and welfare of the riding public."

He said a form is used for the inspection, and he had seen and reviewed Mr. Stracham's report, but that it had since been destroyed and was no longer available.

He said he had a personal recollection of what the report stated. The court did not permit Mr. Cramer to testify to his recollection of the contents of Mr. Stracham's report.

At this point Mr. Cramer was excused, and Mr. Stracham was recalled. He was asked to explain his guidelines for inspection of tires, and said, "If the tire had a visible tread on it and a good cord and if there was no showing of any bumps or cuts, that would be my guideline." Since that time, he said, the Public Service Commission has guidelines. Appellants proffered to show what the subsequently adopted guidelines were, and the court rejected the proffer. Mr. Stracham was asked what he did in 1967 in inspecting tires, and said:

> "In checking a tire we walk around the car and inspect the tire and it is felt for any bumps, and we check the front end of the tires and if it shows any visible signs of wear on the tire they put it out of the service by using the State sticker you put it out of service, put it on the side of the right rear door on the glass. Then we call the shop steward and tell him what's wrong and not to take the cab out of the yard until it is re-inspected."

Mr. Stracham said again that he had no recollection of having seen the taxicab on July 24, 1967, and said also that he did not see it on the date of the accident.

On this aspect of the case, appellants say that the court erred, a) in not permitting Mr. Cramer to testify to his recollection of the contents of Mr. Stracham's report of July 24, 1967, and b) in not permitting Mr. Stracham to testify to standards for tire inspection adopted by the Public Service Commission some time after the accident.

We see no need to consider whether the Stracham report, no longer in existence, could be proved as a lost document, and being thus restored to a presumptive existence, would be admissible in evidence as a record of

the occurrence made in the regular course of business. Code, Art. 35, §§ 59 and 60. The only possible inference from the evidence showing that an inspection was made on July 24, 1967, and showing the procedure followed in such inspections, is that the tires were approved under the standards then applied. There was no proffer of the contents of the report, and we cannot assume that it contained more.

We agree that evidence of subsequently adopted standards was irrelevant, and inadmissible. Even if those standards had been admitted, there was nothing in evidence to be compared with them, and they could have served no purpose.

### Rulings on Evidence Relating to Damages

A. Evidence of Earnings and Expectation of Increases.

Betty G. Stein, a personnel officer in the Baltimore Department of Social Service, testified that Dorothy A. Walston was employed by the department as a "Social Worker, Assistant 1" at the time of her death, at a salary of $6,518 per year. She testified to various automatic increments since that time which such employees received as state classified employees, and to one automatic promotion to "Social Worker, Assistant 2", which she said was based solely upon the passage of a period of time, and would have applied to Mrs. Walston.

With only these automatic changes, the witness testified that from January 1, 1971, Mrs. Walston's salary would have been $10,075 annually.

Appellees attempted to establish an intent on the part of Mrs. Walston to pursue post graduate studies to obtain a Master's degree and thereby attain a higher classification, but the court ruled that such evidence was speculative, and instructed the jury to disregard it.

Clearly the jury was not being invited to speculate in considering the earnings which the evidence showed Mrs. Walston would have been receiving at the time of trial. There was no error in admitting this testimony.

## B. Evidence of Cost of Domestic Services.

Samuel I. Kaplan, operator of an employment agency in Baltimore which places domestic workers, was called as a witness for the Walston family. Appellants filed a motion to limit, or as expressed in the transcript, to preclude, his testimony. A copy of his pretrial deposition was attached to the motion.

The motion asserted that the witness should not be permitted to testify because his deposition showed that his only insight into the domestic circumstances of the Walston family was that there were six children, but that he was not aware of their ages or sex, did not know the area in which they resided, nor the manner in which they were accustomed to living.

We cannot see how any prospective witness could be barred from being called to testify. Each question propounded to him as a witness, whether it call for a factual answer or an opinion, would have to be ruled upon by the judge presiding at the trial in accordance with the applicable rules of evidence. Furthermore, any opinion he might be asked to express from the witness stand would have to be based, not upon any previous insight into the circumstances, but upon facts put to him in a hypothetical question or otherwise proper for him to consider in arriving at an opinion.

The motion to preclude the testimony of Mr. Kaplan was properly denied.

After Mr. Kaplan described his experience in the placement of domestic workers in employment in the City of Baltimore, and his familiarity with the various services performed in such employment, and their value, and the prevailing wages in 1967, the court found the witness to be a qualified expert in that field. That ruling was a proper exercise of the court's discretion. And it appeared that the knowledge and experience of the witness in the field was such that his opinion would aid the trier of fact. *Consolidated Mechanical Contractors, Inc. v. Ball,* 263 Md. 328, 338, 283 A. 2d 154.

Mr. Kaplan was asked a question describing the domestic services previously described in the evidence as having been performed by Mrs. Walston, and was asked if he had an opinion, to a reasonable certainty, of the value of those services in 1967. He said he had an opinion, and that the value was $75.00 per week. He said the figure was based on actual placements his service had made in this type of job order in 1967.

Objections and motions to strike were made throughout the procedure of arriving at this answer, and were overruled or denied. Appellants argue here that none of Mr. Kaplan's testimony should have been allowed because, a) the value of the domestic services performed by Mrs. Walston for her husband and children was not a proper element of damages, and b) the value of such services in a matter within the common knowledge of the jury, and no expert testimony was required.

In *Industrial Service Co. v. State, Use of Bryant,* 176 Md. 625, 6 A. 2d 372, the Court of Appeals in a 1939 opinion dealing with a 1937 wrongful death, recognizing that the value of housekeeping services performed by the deceased wife and mother was a proper element of damages, considered whether expert testimony as to the value was admissible. The Court said, at page 635:

> "The fair and reasonable value of the services rendered in a country home similar to Bryant's depends upon many factors, such as the woman's proximity to the home, the prevailing prices for similar services in the community, and the season of the year. It cannot be said that jurors residing in Baltimore City were, by reason of their experience in the business affairs of life, possessed of any such common knowledge of those factors in Anne Arundel County as to enable them without the aid of some testimony to fix their value."

After further discussion, the Court said, at page 636:

> "It cannot, therefore, be said that the testimony

> which [the witness] gave was not without some probative value, and was not an aid to the jurors in assessing the pecuniary loss sustained by the equitable plaintiffs."

Appellants point out that part of the *rationale* of the *Bryant* case was that the plaintiffs lived in a "country home" in Anne Arundel County, and the case was tried before jurors residing in the City of Baltimore. The Court, in holding the evidence may have been an aid to the jurors in that case, mentioned a few of "many factors" upon which the fair and reasonable value of the services depended.

We cannot say that opinion evidence in this case would not aid a jury in 1971 in assessing the 1967 pecuniary value in the City of Baltimore of the combination of household and domestic services of which the Walston family was deprived by Mrs. Walston's death.

The testimony of Mr. Kaplan was properly admitted, and the motions to strike it were properly denied.

C. Evidence Projecting Loss of Earnings and Cost of Domestic Services.

On behalf of the Walstons, Dr. Carl Christ, a professional economist at Johns Hopkins University, was called as an expert witness. His qualifications were not questioned. After being supplied with facts in evidence as to the dates of birth of each member of the Walston family, the date of Mrs. Walston's death, the joint life expectancy of Mr. and Mrs. Walston at the time, her salary at the time of her death and the subsequent automatic increases which would have been realized down to January 1, 1971, Mr. Walston's earnings on both dates, and the value of domestic services, he brought the past figures to a current date, and projected them into the future. He explained various assumptions he made, based upon standard tables, published studies, economic indices, professional literature, and other sources and authorities which he described.

With respect to Dr. Christ's testimony, appellants urge that the court erred, in that:

(a) They should have been granted a continuance to prepare for cross examination because the witness, only a few days before, submitted a newly revised report.

(b) The witness was permitted to answer improper hypothetical questions.

(c) Their motion to strike the testimony of the witness should have been granted.

(a) Since the case will be remanded for a new trial on the question of damages, the request for more time to study the economist's report is moot.

(b) Appellants' objections to hypothetical questions were based upon their contention that the questions called for the assumption of facts which had been admitted into evidence improperly. We have held that the admission of that evidence was not improper.

(c) In support of their motion to strike the testimony of Dr. Christ, appellants contended that his testimony was improper because the sources for certain facts he used and assumptions he made were not in evidence.

The answer to this contention was given by the Court of Appeals in *Casualty Ins. Co. v. Messenger,* 181 Md. 295, 29 A. 2d 653, where the Court said, at pages 298 and 299:

"It is not a ground for excluding the testimony of an expert that he bases his statements in whole or in part upon what he has read, provided that his reading can be assumed to constitute part of his general knowledge adequate to enable him to form a reasonable opinion of his own. A witness is qualified to testify as an expert when he exhibits such a degree of knowledge as to make it appear that his opinion is of some value, whether such knowledge has been gained from observation or experience, standard books, maps of recognized authority, or any other reliable sources. The knowledge of an ex-

pert in any science or art would be extremely limited if it extended no further than inferences from happenings within his own experience. His testimony is admitted because it is based on his special knowledge derived not only from his own experience, but also from the experiments and reasoning of others, communicated by personal association or through books or other sources."

See also *Consolidated Mechanical Contractors, Inc. v. Ball, supra,* and *Plant v. Simmons Co.,* 321 F. Supp. 735.

D. Proffer of Excerpts from Deposition.

Appellants proffered to read into evidence some 13 lines from a pretrial deposition of Richard B. Walston. The court, "after hearing discussion from counsel and reading the case offered" denied that request. The record does not contain the discussion, nor the deposition. We have no way of knowing what was proffered, nor the reasons advanced for and against its admission. There is nothing we can rule upon.

*Denial of Appellants'*
*Motions for Directed Verdicts*

At the conclusion of all of the evidence Sun Cab and Ash filed written motions for directed verdicts in each of the three cases in which they were the defendants. Ash made an oral motion for a directed verdict in his favor in the case in which he was plaintiff.[3] All of the motions were denied. Similar motions made as defendants at the close of the plaintiffs' cases were withdrawn when the defendants offered evidence. Maryland Rule 552 b.

---

3. The motion by Ash as plaintiff could not have been granted even if it had merit as to negligence. He did not ask for a partial directed verdict, either as to negligence, or as to the broader question of liability. See *Richardson v. Boato,* 207 Md. 301, 114 A. 2d 49, *Peroti v. Williams,* 258 Md. 663, 267 A. 2d 114, and *Levin v. Arrabal,* 11 Md. App. 89, 272 A. 2d 818.

Appellants' written motions asserted these grounds:

1. There was no legally sufficient evidence of negligence on their part.
2. The evidence failed to show that the proximate cause of the accident arose from the bald tires alleged to have been on the taxicab.
3. That the plaintiffs attempted to prove details of the happening of the accident, thereby foregoing reliance upon inferences which may have been drawn from the facts.

The witness Raymond E. Hensley testified that he was standing in the front yard of his home, the fifth row house from the corner, and saw the taxicab go through the intersection and proceed east on Edmondson Avenue. He said he saw the red tail lights of the cab come on, saw the cab slide and jump over the median to the other side of the street, where it was hit by a truck. He testified that it was raining and the streets were wet. He said the cab was going between 30 and 40 miles an hour, and that there were no vehicles close behind the cab in its lane.

Mr. Hensley went to the scene and observed the taxicab. He said all four tires were slick, or bald.

Officer Gray testified that the speed limit at that point was 30 miles an hour. Other witnesses corroborated various aspects of the evidence given by both of these witnesses.

The standards by which a trial judge examines the sufficiency of the evidence to require resolution by a jury need no repetition.

Evidence of the speed of the taxicab just before the accident justified a rational inference by the jury that Mr. Ash was driving at a speed either in excess of the legal maximum, or greater than was reasonable under the circumstances. Other circumstances were that the

street was wet, and that the tires on the vehicle were bald.

In *Hanes v. State, Use of Lamm,* 236 Md. 28, 202 A. 2d 364, the Court of Appeals declined to apply the "too much and too little" rule of *Hickory Transfer Co. v. Nezbed,* 202 Md. 253, 96 A. 2d 241, and said, at page 34:

> "We do not agree that too much was proved, and we think enough was proved to permit an inference of negligence."

As in *Hanes,* the exculpatory testimony relied upon by appellants here simply was not believed by the jury.

The inferences rationally to be drawn from the circumstances shown here entitled the jury to find that Mr. Ash was negligent, and that his negligence was the sole proximate cause of the accident.

*Christ v. Wempe,* 219 Md. 627, 150 A. 2d 918, *Keitz v. National Paving & Contracting Co.,* 214 Md. 479, 134 A. 2d 296, and other cases cited by appellants are distinguishable. It should be noted that the application of the "too much and too little" rule of the *Hickory Transfer* case was rather sharply circumscribed by the Court of Appeals in *Blankenship v. Wagner,* 261 Md. 37, 273 A. 2d 412, when Judge Finan said for the Court, at page 46:

> "If the plaintiff has circumstantial evidence which tends to show the defendant's negligence (and which is therefore *consistent* with the inference relied upon in *res ipsa loquitur*) he should not as a matter of policy be discouraged from coming forth with it. If, however, the evidence introduced by the plaintiff or the defendant shows that everything relative to the case is known, and that the injury might have been caused by something other than defendant's negligence (thereby negating the inference normally relied upon in *res ipsa loquitur*), then the plaintiff will not be allowed to avail himself of

the doctrine. In such a case, if plaintiff's proof fails to make out a *prima facie* case of negligence then it is proper to direct a verdict for the defendant. *Lee v. Housing Authority,* 203 Md. 453, 465, 101 A. 2d 832 (1954)."

The evidence here did not show that everything relative to the case was known. Mr. Ash was unable to say why his taxicab went out of control. Perhaps he never knew why. It cannot be said that everything is known merely because an exculpatory explanation is advanced. The jury has the right to determine the weight to be given to the explanation and the credibility of the witness who gave it, and, as it did in *Hanes,* reject it.

The motions of appellants for directed verdicts in each of the three cases against them were properly denied.

### Rulings on Instructions
### Relating to Liability

A. Effect Upon Subsequent Trial on Merits of Granting Leave to Sue Unsatisfied Claim and Judgment Fund Board.

Sun Cab and Ash argue earnestly that the trial judge erred in not instructing as they requested, as to the binding effect, for purposes of this trial, of the leave previously granted to Ash to sue the Unsatisfied Claim and Judgment Fund Board. They argue with relation to what they describe as requested instructions numbered 6 and 20.

Those requests, as such, are not before us. We look to the exceptions which the transcript shows were taken at the conclusion of the instructions. The exceptions sufficiently informed the trial judge that Sun Cab and Ash contended that when Ash was granted leave to sue the Board there was a finding of fact, binding in the subsequent trial of the case, that the cab driven by Ash was struck by an unidentified vehicle, that the striking was a negligent act by the unidentified driver and was the

proximate cause of the cab's going to the wrong side of the road, and that Ash was free of contributory negligence; in other words, that he had established a cause of action.

The trial judge correctly declined to instruct the jury that such was the law. The purpose behind the statute, its general structure as to procedure, and its specific wording, all belie such an interpretation. If there were any room for doubt, it was removed by the opinion written by Judge Digges for the Court of Appeals in *Weber v. Unsatisfied C. & J. Fund Board,* 261 Md. 457, 276 A. 2d 86. After discussing the meaning of the phrase, "cause of action", the Court said, at page 462:

> "This indicates a legislative intent that the phrase 'has a cause of action' merely requires a showing by the applicant that he can state or allege facts indicating a breach of duty by an operator of a phantom vehicle that caused him damage."

Further on the same page, after referring to Weber's version of the operative facts of the accident, the Court said:

> "He did not have to prove these allegations at the hearing, but only satisfy the court that his claim was legally actionable. All that is required under § 7-620 (4) is an assertion of facts, which, if proven at trial, would compel recovery. Any decision on the facts themselves should be made at the later trial."

The statute permits a qualified plaintiff to sue the Board (formerly the Commissioner of Motor Vehicles) as a stand-in for an unidentifiable person who would, if identifiable, be named as a defendant. Before a plaintiff may sue the statutory stand-in, certain requirements must be met. Some go to the plaintiff's eligibility to claim the benefits of the law. The requirement with which we are concerned is that he must allege facts which would

constitute a cause of action, proof of which would entitle him to recover damages. This is the same test to which a demurrer puts any declaration.

While leave to sue may be granted only after the plaintiff has made a satisfactory showing to meet several requirements, *e.g.,* that he carried insurance on his own vehicle, that his operator's license was valid, and that he had made all reasonable efforts to ascertain the identity of the person or persons he should name as defendants, these prerequisites to the right to sue the Board have no place in the trial on the merits of negligence and damages. They should not go before the jury at all, either as evidence or in the instructions. They have no relevance to the issues then being tried. The issues of negligence, primary and perhaps contributory, as well as damages, are then tried "from scratch", and the prior leave to sue gives the plaintiff no more head start than any plaintiff has when a demurrer to his declaration is overruled. He is merely given his day in court, but once in, he stands or falls on the proof he presents to support the claim he has asserted.

B. Motor Vehicle Statutes.

In his instructions the trial judge read to the jury certain portions of the motor vehicle statutes dealing with reckless driving, speed, and driving on the wrong side of the road. He went on to tell the jury that, "If you find that the defendant taxicab was being operated in violation of any one or more of the aforementioned provisions of the Maryland law, and that such violation, or violations, was the proximate or contributing cause of the accident, then your verdict must be for the Walstons and the Moores and against the defendants, Curtis Lee Ash and Sun Cab Company."

The judge had previously defined proximate cause.

Appellants argue, citing authority, that mere violation of a statute will not support an action unless the evidence shows that the violation was a proximate cause. The argument is valid, but not applicable. The judge

clearly made it a condition of basing a verdict upon a violation of the statutes he had read, that the violation be the proximate or contributing cause of the accident.

It is also contended by appellants that the evidence was not sufficient to permit the application of the statutory rules given to the jury, and therefore it was error to give them. This contention is without merit.

*Other Rulings on Instructions*
*Relating to Damages*

A. The Necessity in Wrongful Death Cases of a Lump Sum Damage Finding Before Apportionment.

At the conclusion of a long trial, this multi-party, multi-issue case was submitted to the jury with instructions that it answer a series of written issues. Maryland Rule 560.

After explaining to the jury the measure of wrongful death damages, Judge Howard continued:

> "You are instructed the total amount you assess as damages to the surviving husband, Richard Walston, and the six surviving children of the deceased, Dorothy Walston, is to be apportioned as set out in the issues in this case. You will be given a copy of the issues.
>
> It is the opinion of the Court and counsel that it would be advantageous to submit these cases to the jury on issues. Pursuant thereto, your foreman will be given seven issues which you will take into the jury room with you. We believe if you follow the instructions and answer the questions therein contained, you will reach the verdicts required in all of these cases."

The written issue which related to the Walston damages was:

"5. Answer this question only if your answer to question #2 was yes.

a. In what amount do you assess damages in favor of the Plaintiff, Richard B. Walston, in his capacity as Administrator of the Estate of Dorothy A. Walston? $........

b. In what amount do you assess damages in favor of Richard Walston as surviving husband of Dorothy Walston? $........

c. In what amount do you assess damages for Tanya Walston as surviving daughter of Dorothy Walston? $........

d. In what amount do you assess damages in favor of Sharon Walston, surviving daughter of Dorothy Walston? $........

e. In what amount do you assess damages in favor of Ricky Walston, surviving son of Dorothy Walston? $........

f. In what amount do you assess damages in favor of Terry Walston, surviving daughter of Dorothy Walston? $........

g. In what amount do you assess damages in favor of Donna Walston, surviving daughter of Dorothy Walston? $........

h. In what amount do you assess damages in favor of Kimberly Walston, surviving daughter of Dorothy Walston? $........"

By way of exception, counsel for Sun Cab and Ash said:

"* * * we except to the failure of the Court to grant Instruction No. 9, determining that the damages to be allowed in this case are to be considered as a unit for the surviving family, and that therefore this is to allocate the amount of those damages from the instructions to be given to the jury as the issues presented."

* * *

"In the matter of the damages, I think Issue No. 5 is somewhat inconsistent with what the Court instructed, and that it should be in what amount you assess in favor of Richard B. Walston in his capacity as Administrator of the Estate of Dorothy A. Walston as the surviving husband, and then underneath of that it should be what amount you then apportion to Richard B. Walston and the children, and so forth. This gives the jury the impression that they have been through that assessing damages. In fact, apportion the total amount as the Court referred to it in the instructions, and it could be misleading, and can the Court remind the jury, although it would be assessed and set out separately, that in fact according to the instructions it should be apportioned."

Upon these instructions and exceptions appellants argue that there was error because the law "requires the judge to instruct the jury that they shall assess damages in one amount and that the father and the children are to be considered as a unit and that once that amount is determined, it is to be proportioned among the husband and children in whatever proportions the jury shall determine." [4]

4. We can only characterize as overzealous the further argument of appellants that the total verdict would be the same whether Mrs. Walston left only a husband, or left a husband and six children.

In support of this contention appellants argue that a lump sum finding as a prerequisite to apportionment is required by the statute and by the Q Rules of Maryland Rules, Chapter 1100, and by the interpretation of the statute in *Passapae v. Oehring,* 141 Md. 60, 118 A. 130.

Both the statute and the Rule require *division,* or *apportionment;* they do not require, although they do not exclude, a lump sum finding of wrongful death damages. In *Passapae v. Oehring, supra,* it is true that the Court observed that such damages should first be stated as an aggregate sum, then divided among the parties, and said that this has been the general practice. However, the Court was dealing with a verdict which awarded *only* one aggregate sum, which the jury failed to apportion. The holding in that case was that since the whole amount of damages for which the defendant was liable was determined by the verdict, he had no direct concern with the apportionment among the plaintiffs.

It is self-evident that in finding damages sustained by two or more persons arising from the same wrongful act, when the damages of each may or may not differ, the jury must of necessity determine the damages sustained by each person before it can arrive at a total. It seems to be of no consequence that in the process of building up to a total, then breaking the total down again into its original components, the jury did not record the total as a separate figure.

Indeed, the issues as submitted to the jury provided no place to record the total. If this was an omission, it was not **error.**

B. Decedent's Earnings at the Time of Death as an Element of the Pecuniary Loss Sustained by Husband and Children.

The trial judge instructed the jury that the husband and children of the deceased were entitled to the pecuniary loss, both past and prospective, suffered as a result of her death. Amplifying, with respect to the husband he referred to financial contributions, and with re-

spect to the children he referred to support, maintenance and education.

Appellants excepted to the court's refusal to instruct the jury that it must disregard any testimony relative to advancement in category or increase in earnings since the date of death, and that the only earnings figure to be considered was the amount of decedent's earnings at the date of death.

There was evidence that Mrs. Walston was employed in the Department of Social Service in Baltimore, and of the salary she was receiving at the time of her death. There was also evidence of the automatic raises and promotions that she would have received up to the time of trial, by merely remaining in her employment. In *Jennings v. United States, supra,* Judge Watkins recognized the speculative nature of many factors which could have had a beneficial or an adverse effect upon the future earnings of the decedent there, but felt that it was sound to consider those increases in earnings which the evidence showed would have been automatic with the passage of time and satisfactory service between the date of death and the date of trial.

We think it was proper to permit the jury to consider that evidence, and that it would have been error for the court to instruct as requested by appellants.

### Rulings on Question of
### Disqualification of Juror

On Thursday, February 18, 1971, Judge Howard's clerk reported to him that he had learned that two veniremen on jury service had heard a member of the jury panel in this case say that his mind was made up and that a lot of money would be given away in this case. The judge questioned one of the veniremen late that day, and the other the next morning, and then questioned the panel member. Each interview was separately conducted in chambers, and recorded by the court reporter, with no one else present. The judge then called all counsel into chambers, fully explained what had occurred, and asked

to hear from them. The interviews were read back, except one, then unavailable, which was read to counsel on the next court day.

One of the veniremen said that the two of them, at noon Wednesday, in the jury waiting room, had heard an unidentified person behind them relate that he had heard the statements made by a member of the jury panel in this case. The other venireman said the conversation had been overheard Wednesday morning, before court convened, while they were sitting in Judge Howard's courtroom. The two versions did not agree with each other, and neither agreed with what the clerk had originally reported to the judge. Both attributed the conversation they overheard to some person they could not identify; not to the panel member.

On the other hand, the jury panel member told the judge that he was very conscious that there seemed to be a lot at stake in the case, and said that he had not talked with anyone about it.

Appellants moved that the court declare a mistrial, saying that while there was no reason to believe one party as against the other, it would be too big a gamble, and merely removing the juror from the panel may not be sufficient. The motion was denied. After all the evidence was concluded, appellants renewed "the motion for a mistrial in this case based upon the conversations which have allegedly occurred between the three men who were questioned by the Court and for the reasons that were previously stated * * *." The renewed motion was denied.

At no time did appellants question the propriety of the procedure followed by the trial judge after the possible disqualification of the juror was brought to his attention. Nor did they request the opportunity for further examination of any of the principals involved. They did not contend that the procedure was in any way prejudicial. No question concerning it is before us. Maryland Rule 1085.

Following denial of their first motion for a mistrial, appellants moved that the juror be excused from the panel and replaced by the remaining alternate juror. During the colloquy on this motion, the court inquired whether appellants would be willing to proceed with 10 or 11 jurors if one or two others became ill before the end of the trial. Counsel responded that he "would not submit to less than twelve jurors".

The court declined to take the juror off the case. Later that day the motion to withdraw the juror was renewed, and was again denied. After the close of all the evidence appellants again renewed the motion. At that time the court reserved ruling. The next morning, before instructions to the jury, the motion was denied.

We think one question, in two aspects, is before us. We must determine whether there was sufficient reason to require the court, in the exercise of its discretion, to conclude that there had been such misconduct as to indicate that a fair and impartial trial could not be had. If so, and the misconduct might have affected more than one juror, perhaps a mistrial would have been the only remedy. On the other hand, if one juror, but no more, was affected, it might have been appropriate to withdraw him and seat the remaining alternate.

Authorities cited by appellants are concerned with action the court should take when misconduct has in fact occurred. We do not reach that problem.

The Court of Appeals considered a very similar situation in *Jos. F. Hughes v. Stockhausen,* 212 Md. 559, 129 A. 2d 844, where Judge Henderson, for the Court, said at pages 562 and 563:

> "The appeal from the judgment properly presents the question of the correctness of the court's ruling on the motion for mistrial, even if we assume that after a trial is concluded a juror may not impeach his verdict, *Williams v. State,* 204 Md. 55, 65, and that the point would have been waived by failure to object, after

knowledge of the alleged misconduct, prior to the time the jury retired. *Brawner v. Hooper,* 151 Md. 579, 593. It is true that it is highly improper for jurors to discuss with outsiders a case on trial before them, but as stated in *Rent-A-Car Co. v. Fire Ins. Co.,* 163 Md. 401, 408, 'Not every trivial act on the part of a juror during the course of the trial amounts to such misconduct as requires the withdrawal of a juror and the continuance of the case. * * * the misconduct must be such as to reasonably indicate that a fair and impartial trial could not be had under the circumstances.' It was also said (p. 409) : 'The better rule in such cases would seem to be that such questions be left to the sound discretion of the trial court, whose decision should only be disturbed in those cases where there has been a plain abuse of discretion, resulting in palpable injustice. Especially should this be true in cases where there is conflict of evidence as to whether the act constituting the alleged misconduct in fact occurred.' "

See also *Safeway Trails, Inc. v. Smith,* 222 Md. 206, 159 A. 2d 823, which applied the same rule, and *James v. State,* 14 Md. App. 689, 288 A. 2d 644, in which we affirmed the action of a trial judge in denying a mistrial sought because the judge removed a juror from the panel and seated an alternate.

We see no abuse of discretion by the trial judge in finding no misconduct by the juror, and in denying the motions for mistrial and to substitute an alternate for the juror.

### Contention That Rulings of the Court Indicated a Pattern of Favoritism to Plaintiffs

A general argument made in appellants' brief is that the rulings of the trial court were indicative of a predetermined pattern designed to assure a favorable plaintiffs' verdict. In support of this contention appellants

refer to a substantial number of rulings unfavorable to them, the more significant of which are the basis of separate assertions of error in appellants' brief.

A review of virtually the entire 1,161 page transcript of this trial, without tabulating an actual count, shows that the rulings favorable or unfavorable to one side or the other seem to be distributed as might be expected in such a trial.

The real test, of course, is whether the rulings adverse to appellants, regardless of their number, were or were not erroneous. We have found that one ruling was erroneous. The others complained of were not erroneous. We find no predetermined pattern of any kind.

### Motions in Arrest of Judgment

Appellants contend that their appeals from orders denying their motions in arrest of judgment bring before us for appellate review the entire record below, which we should search for any error, whether or not raised below. Applying this theory of the scope of the motion, appellants ask us to find reversible error because

1. The verdict differs materially with the issues and instructions;

2. The verdict is inconsistent so as to sustain a judgment at law; and

3. The verdicts are excessive.

A motion in arrest of judgment had no such broad reach even at common law, and it has less today. Sometimes described as a belated demurrer, a motion in arrest of judgment formerly did bring the whole *record* before the court to search for fatal error. Upon appeal from denial of the motion below, the Court of Appeals likewise searched the record for error, 1 Poe, Pleading and Practice (Fifth Edition), § 761.

However, the *record* thus searched did not include evidence, rulings or instructions, but was limited as defined in 2 Poe, Pleading and Practice (Fifth Edition), § 312:

"The record, strictly speaking, consists of the

order for the writ, the writ, the pleadings, the verdict and judgment. It should also show all interlocutory proceedings, such as continuances, and also some other matters, such as motions in arrest of judgment and the like. But it does not contain the evidence nor the rulings of the court upon points arising during the trial, nor even the opinion of the court."

We do not agree with appellants that the common law definition of the record is broadened by the requirements of Maryland Rules 826 and 1026 specifying the original papers which must be transmitted to the Court of Appeals or to this Court on appeal. The Rules use the word in an entirely different context, and its meaning as defined there is applicable only within the scope of those Rules.

The defects on the face of the record, which at one time were reached by a motion in arrest of judgment, were limited by Acts of Assembly, 1888, ch. 547, to defects in the verdict. Defects in the record prior to verdict were waived if not raised by demurrer to the declaration or other pleadings. This statute, last codified in the Code of 1951 as Art. 75, § 11, was construed in *Hajewski v. Baltimore County,* 184 Md. 161, 40 A. 2d 316, where the Court said, at page 166:

"However, since the passage of Chapter 547, Acts of 1888, now codified as Section 11, of Article 75, Code of 1939, judgments may not be arrested for any defects prior to the verdict."

Section 11 was repealed in 1957, as were many other procedural statutes, deemed to have been superseded by Maryland Rules. Rule 651 contains substantially the same language. The Editor's note to Rule 651 refers to the repealed statute, and states that "It appears that no change was intended".

The Court of Appeals has consistently held that the trial court is the exclusive tribunal to pass upon excessiveness of a verdict. *B. & O. R. R. v. State, Use of Hauer,*

60 Md. 449, *Johnson v. Zerivitz*, 234 Md. 113, 198 A. 2d 254. Appellants are mindful that this general rule ordinarily applies, but feel that their motion in arrest of judgment provides side door access to this Court on the question of excessiveness. If they were correct, the general rule would be nullified. The contention is not valid.

The question remaining is whether the verdict was so inconsistent that no proper judgment could be entered upon it. We see no difficulty in the entry of proper judgments on the verdicts of the jury. The cases were submitted to the jury requiring a special verdict upon written issues which were simple and direct, and called for simple and direct answers. This procedure, authorized by Maryland Rule 560, was designed for just such cases as this, involving multiple issues and multiple parties, and its use is in the discretion of the court. The trial judge told the jury that it was the opinion of the court and counsel that it would be advantageous to submit these cases on issues. There is no indication that the judge misstated counsel's position. The issues were well designed to result in findings by the jury upon all facts necessary for the entry of proper judgments determining the rights of all the parties in all the cases before the court.

It is of interest to observe that the transcript shows that after the foreman announced the jury's answers to each of the issues, and the individual jurors were polled as to those answers, the jury was harkened to its verdicts in the four cases in the form of general verdicts. They were recorded on the respective dockets as general verdicts, and judgments nisi as required by Rule 560 a 6 were entered. The process of molding the jury's findings into proper shape to become the basis for judgments of the court was completed. There was no objection to this procedure.

We do not think the verdicts were defective in form, but if they were, the intention of the jury was manifest and beyond doubt and it would have been the duty of the court to work the verdicts into form and make them

serve. *Davis v. Board of Education,* 168 Md. 74, 176 A. 878.

*In No. 542-A.:*

*Judgment in favor of Richard B. Walston, Administrator, against Sun Cab Company and Curtis Lee Ash, affirmed.*

*Judgment in favor of Richard B. Walston, Tonya Rene Walston, Sharon Rochelle Walston, Ricky Andre Walston, Terry Walston, Donna W a l s t o n, and Kimberly Walston, against Sun Cab Company and Curtis Lee Ash, affirmed as to liability, but reversed in part, and remanded for a new trial on the question of damages.*

*Judgment in favor of Wilton E. Moore against Sun Cab Company, Incorporated and Curtis Lee Ash, affirmed.*

*Judgments in favor of James Moore, an infant, and Wilton E. Moore 'against Sun Cab C o m p a n y, Incorporated and Curtis Lee Ash, affirmed.*

*A p p e l l a n t s to pay three fourths of the costs of the transcript, appellants' brief and brief of appellees Richard B. Walston, etc., et al., and all of the costs of the brief of appellees Wilton E. Moore, et al. and all of any other costs.*

*In No. 542-B:*

*Judgment affirmed.*

*Appellant to pay all costs not taxed in No. 542-A.*